Your argument next in number 2009-1217, In Re Rackman. Well, Mr. Rackman, when you're ready. Good morning, your honors. May it please the court. KSR warned against finding an invention obvious based solely on the fact that various elements can be found in the prior art. KSR said there has to be a reason for combining them. There was no reason in this case and the director's brief doesn't even try to establish that there was a reason for combining the two pieces of prior art in which the board relied. There are two reasons for this. First, the prior art that the board relied upon points to, it's prior art that is vastly different from the field of the invention. The invention, and I'm assuming that everybody's familiar with video games. Oh, I thought you were going to say with the record in this case. You can assume we understand the facts of the case. I've appeared here before, I know you are. Okay, very good. The invention allows the manufacturer of a video game to control whose software will run on that machine. Today it means that Sony is the only one who can control whose software will run on a PlayStation. Microsoft is the only one who controls whose software will run on an Xbox. Not only did the board disregard the fact that none of the prior art did this, but the board disregarded the fact that there are two fundamental operating principles of a video game machine that you don't find in the prior art in which they relied. I think those two principles are kind of obvious. One is you have to be able to load external software into the machine. If you just look at any video game that your children and grandchildren play with, they're loading external disks into the machine so they can play a new game whenever they want to play a new game. The other operating principle that's necessary is that all machines have to work the same way. If you want to go buy a game for a video machine, you go into a store and buy it. You don't want to have to buy custom-made software to work in your machine. Counsel, I understand your argument, and I understood the board opinion, to focus on whether or not Weinstein disclosed encrypted executable instructions rather than data. Weinstein does disclose encrypted data, correct? Yes. But it doesn't disclose, and you do claim, encrypted executable instructions. Yes. And so that's where they then pulled in flies or best. Each of those two references, they said, either one of which would provide the missing element of Weinstein. What the board did, Your Honor, was, and throughout the opinion, they've repeated this over and over again. They said that the Weinstein machine has everything that is in my claim, except that the disk has just data and not encrypted instructions on it. Now this is a critical point because the premise of the argument is 100% wrong. Most of the claim is about the machine. If you read the elements of the claim, you'll see that virtually none of them are in Weinstein. And on pages 6 to 8 of my reply brief, I go over the elements of the claim, and I show that none of them are in Weinstein. So the basic premise of the board, that Weinstein has everything in the claim, except instructions on the disk, is wrong. Counsel, I have my claim chart here that my outstanding law clerk generated for me. So why don't you start with what you think is the element of claim one that is most conspicuously absent from Weinstein, not including the encrypted instructions, because the board has clearly acknowledged that the encrypted instructions are not present, and that's why they need flies or best. So choose something other than that, because they've already acknowledged that, and tell me which one is, in your mind, the clearest and most egregious error in the board's fact-finding. Let's start with the first one. I'm looking at the characterized clause. Characterized by a read-write memory. By the way, that memory, I agree, that is in Weinstein. It's the only element that is in Weinstein. Let's go on from there. The data processing means further controlling generation of memory-accessing address signals to allow accessing blocks of encrypted instructions. Right, but the board... Okay, let me back up. Maybe I wasn't clear. The board acknowledges that encrypted instructions are not present in Weinstein, and your argument... On the disk. The board said that Weinstein's disk does not have encrypted instructions, but the machine has everything else that's in the claim. They say it over and over again. And I'm going over the claim, and I will show you that none of the elements of the claim is to be found in the Weinstein machine. Okay, so just pick your best one. Give me your best one. Which one is your best one? Well, I started with the first, and that is the one that says, accessing blocks of encrypted instructions. The machine, the Weinstein machine, does not read encrypted instructions from a cartridge. The Weinstein, the last thing he would do would be to allow external instructions to control his machine. He basically said that. Can you imagine a credit card terminal where a hacker could program it to give himself unlimited credit? Okay, but in the Weinstein abstract, it states each card has stored in it a code, which is the encryption of a, let's see, concatenation... I don't know how to say that word, of a user's secret password and a common reference text. And I believe this is part of what the board had cited. So why is that not establishing the presence of... Weinstein's disk or input medium had a password on it. His invention was that the password was half selected by the user, half selected by American Express, the credit card company. But Weinstein, it was a password. It was not instructions. The man said he was deathly afraid of allowing external software to control his machine. A password, yes. That was the purpose of his machine. The user inputted a password on the keyboard. The card had an encrypted password. The machine would decrypt the password, and if it matched what the user inputted, then it would say, okay, he's the owner of this credit card. But Weinstein was not a machine that read and executed external software. Weinstein, would you agree that it uses judicially selected string lengths? That Weinstein discloses and suggests judiciously, as opposed to judicially, judiciously selected string lengths? Of what? It says, in accordance with the principles of public key encryption and assuming judiciously selected string lengths, the probability is infinitesimal of a forger selecting a random code, which, when decrypted with the public key, has a predetermined substring. It's a password, yes. A judiciously selected password. But the invention in suit here is a machine that takes an external disk and loads software and then runs that software, and Weinstein doesn't do that. You've definitely established with, I think, irrebuttable clarity that this invention is not anticipated by Weinstein. The problem is that doesn't answer the board's point that Weinstein, when you look at it critically, is not that far from what you've got. And you say, well, Weinstein had an entirely opposite objective. But if you look at, you take the idea of encrypted data and substitute encrypted software, then you've got the invention, correct? Except that the Weinstein machine can't do anything with encrypted software. If you put encrypted software on the disk, which is what the board says is the obvious thing to do, what does Weinstein's machine do with it? The man says he doesn't want to read external software. He's got a credit card terminal. He doesn't want people programming his credit card terminal so that they can issue false, give themselves false credit. The last thing he wants to do is to load external software into his machine. And what is the claim about? The claim says, load encrypted external software into the machine. Decrypt the external software. Load the decrypted external software into memory. Then execute that decrypted stored software that's in memory. The whole machine, the whole claim is about a machine that reads external software and what it does with it. And Weinstein's whole machine is a machine for which it would be anathema to read external software and to execute it. The fact that Weinstein also uses public key cryptography for authentication purposes, that's admitted. That was done in 1976 by Diffie and Hellman. I'm not the inventor of public key cryptography for authentication purposes. What I said was, I took public key cryptography, the authentication principle that was described in 1976 and was used by Weinstein, and I said, I can use it for a new purpose. My purpose is to allow the machine manufacturer to be the only one to control the running of software on that machine. That is an object that was not articulated by anyone in the prior art. Not Fleiss, not Weinstein, not Best. So for the board to come up and say that it's obvious just to combine this prior art, and you have it because the elements that go into the invention are in the prior art, it makes no sense. Not to mention that the two pieces of prior art on which they rely teach away from each other. I have a whole section relying on the Duke Q case that came out after I filed the initial brief, which talks about how prior art that teaches away from each other should not be combined in an obvious rejection. And that is clearly what we have here. The two pieces of prior art here clearly teach away from each other. Let me, Mr. Reckman, interrupt. You're well into your rebuttal time. Would you like to save any of it? Yes. Okay, maybe we'd better hear from Mr. Johnson. We'll have you back when he's done. Thank you. May it please the Court. This Court is correct that Weinstein teaches all of the claimed limitations except for one, which is software. Instead of software being loaded onto the insertable medium, Weinstein stores data. However, this missing feature was already known in the prior art as evidenced by Fleiss and Best. Why would you combine them? Because Weinstein, as Mr. Reckman suggests, he doesn't want all of these instructions loaded onto his machine. So it's not readily apparent why Weinstein would, for example, if you were going to modify the Weinstein machine or software and machine, why you would necessarily do so to bring in all of the instructions. Sure. One of ordinary skill in the arts, seeing Fleiss and Best, would understand that Weinstein doesn't need to be limited to just data being stored on the insertable device, but that it could actually be improved and increase its capabilities. It doesn't need to be limited to it, but why would someone do it? Sure. With software, you're able to display graphics, and the card issuer might want to have its logo displayed when the card is being used. So with software being added to the actual insertable medium, you're increasing the capabilities of the actual card itself. So did the board make a fact finding that it would be advantageous to combine those, or that it would be easily recognizable to one of skill in the art, that it would be advantageous to make that combination? What the board did was... I'm trying to figure out what fact finding you want me to find to put Weinstein with Fleiss and Best. Sure. The board's fact finding, which agreed with the examiner, that by adding software, you're actually increasing the capabilities, enhancing the Weinstein insertable device itself. But why would that have been obvious to one of skill in the art? Why would one of skill in the art, or what fact finding is there vis-a-vis what one of skill in the art, why he would have wanted to do that, or why she would have wanted to do that? Sure. It's inherent within the board's finding that by adding software, you'd increase the capabilities of the device itself, that you can do a number of things with software, such as graphics allowing the card issuer to have its logo displayed when it's being used. The notion that it's inherent that whenever you add software, you're increasing functionality, would seem to be a very broad and sweeping rule that I, for one, would be very hesitant to adopt, because that would suggest that virtually every software patent application that is in fact filed, you could reach the conclusion they'd all be obvious, because they all sort of are building on something that came before. Software is not that different from molecules and from elements in the periodic table. So I guess in that regard, I'm a little nervous about what you're asking me for. You're asking me to suggest that just because it would add functionality to something, that that necessarily is enough, and that I should decide that that's all inherent in the board's decision? Well, it wasn't limited to just the board finding that the two references should be combined. They gave a reason. The reason was because it would enhance the capabilities of the Weinstein device itself. And then within that is the understanding from motorboarding and skill in the art that with software you can do a number of things, such as display graphics. But the board also found- When I add brakes onto a bicycle, it enhances the functionality of the bicycle, right? But brakes may not be at all obvious, putting brakes together on a bicycle. So just stating that it enhances the functionality of the underlying product seems to me to be a really big leap, because that would render lots of really non-obvious changes obvious if I were to adopt that rule. Just that it adds functionality. Well, the board also made a second finding as to why the claims here are obvious. And that's because what Rackman did was actually cobbled together what was already known. And under KSR, that is improper. When there's a likelihood that known items are combined and they produce a predictable result, then it would be obvious. And here, that's just what the board found as to why the claims are obvious. So there are actually two reasons why the board determined that the claims are obvious. One was because one of motorboarding and skill in the art would have thought that there was an improvement. But it also found that what Rackman actually did was bring together known features that did nothing new, that they functioned the same way that they ordinarily functioned. And as a result, he was able to achieve a predictable result. And the predictable result here is when you have an insertable device that has software that's loaded onto a machine and that's decrypted, stored, and then run, that everything would work as they normally would. Mr. Rackman argues that there are differences here. But all he seems to be arguing is that Weinstein doesn't include software. But as I mentioned, that is the one feature that is missing from Weinstein. But that is found in Fly's and Best. Fly's and Best shows one of ordinary skill in the art that software can actually be added to Weinstein because Fly's and Best taught an insertable device that had not only software but data as well. So one of ordinary skill in the art reading Fly's and Best would understand that software could be added to Weinstein as well. Mr. Rackman suggests that Fly's and Best teach away. So would you spend a minute and address that for me? Sure. From what I gather from his argument, he seems to suggest that because Fly's and Best have an insertable medium that is unique to its machine, that it teaches away from combining with Weinstein, which allows all of its machines to run the same way. However, what Mr. Rackman is doing is not focusing on the rejection itself. The office relied upon Fly's and Best only for the known concept of adding software to the insertable medium. And it found that Weinstein disclosed all the other elements. So he's narrowly focusing on... The examiner didn't rely on Fly's and Best for a universal medium. That's correct. Only for the teaching that software could be stored on an insertable medium. And I think that he's also arguing that Weinstein teaches away because Weinstein... I'm sorry, that software should not be added to Weinstein because Weinstein thought that a thief could in some way take the password once it's stored. However, what Mr. Rackman has done is only told half of the story. Because what Weinstein determined was that when you encrypt the password with a private key, then the private key can be protected through public key cryptography. Mr. Weinstein was quite clear at A46, column 14, lines 11 through 13, that the password was actually compared at the terminal itself. So Weinstein figured out that with public key cryptography, you can actually protect the password while it is being compared at the machine itself. In fact, Weinstein determined that through his steps, there's no way that a forger could determine what the password is, even when it's being compared at the machine. So one of ordinary skill in the art, reading Weinstein, seeing that Weinstein actually compared the password at the machine, would not conclude that Weinstein teaches away. I believe that Mr. Rackman also argued that Weinstein was limited to a credit card. However, Weinstein is not limited to a credit card. Weinstein is quite clear that smart cards could be used for a number of purposes, including access and database, making airline reservations, decrypting messages and a number of other purposes. And one of the alternate purposes that Weinstein that could be suggested through flies and best, of course, is installing software on the insertable medium itself. If there are no further questions, thank you. Mr. Rackman, you have almost three minutes left. OK, then I'll make three points in the three minutes. Judge Moore, you were inquiring into enhancing Weinstein by adding software and that adds functionality. If you were Weinstein and you took your credit card terminal and you went to your boss and said, I have this great idea. Let's allow external software to be loaded into all of our credit card terminals. You would have been fired for stupidity because you can't allow hackers to come along and program a credit card terminal. It was fundamental to Weinstein not to allow external software to be loaded into his credit card terminal. Second point, Mr. Johnson said that I cobbled together two pieces of prior art with a predictable result. Neither of those pieces of prior art gave the result that I accomplished. I figured out a way for an Atari to sell machines, video game machines, that would allow only Atari to sell disks or cartridges that would work in the machine. This was hardly a predictable result because neither piece of prior art had accomplished it. The third point is on teaching away. Let me explain how the two pieces of prior art teach away from each other. Weinstein, as I said repeatedly, taught not to allow the loading of external software. Flies and Vest, their machines were designed to load external software. They were selling machines that you could load external software into them. So they're clearly opposite on that point. Now let's look at it from the other point of view. Flies and Vest were interested in preventing copying of software. Their technique for preventing copying of software was to sell everybody a different machine and different software. So if they sell you a machine with one program, it doesn't do me any good to copy your software because I have a different machine. So what they did, their object was to prevent copying. They did it by selling everybody different machines and different software. Weinstein had just the opposite. He has the same credit card terminals all over the world. Any credit card has to work the same way in every terminal or else American Express is out of business. So Weinstein wanted all of his machines to work the same way. Flies and Vest wanted all of their machines to work differently. Flies and Vest wanted to load external software. Weinstein said that would be a terrible thing to do. Thank you, Mr. Eckman. The case is submitted. We thank both counsel.